**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**CLINT E. CLARK,**

     **Plaintiff,**

**vs.**                               **Case No. 5:04cv279-RH/WCS**

**BUREAU OF PRISONS, et al.,**

     **Defendants.**

_____/

## REPORT AND RECOMMENDATION

Plaintiff, a federal inmate proceeding *pro se* in this case, filed a motion for summary judgment, doc. 39. Plaintiff also filed his sworn declaration in support of his motion and a statement of facts as to which Plaintiff contends there is no dispute. Doc. 40. Defendants filed a response to Plaintiff's motion that was simultaneously submitted as Defendants' motion to dismiss or, in the alternative, for summary judgment. Doc. 54. The motion for summary judgment fails to comply with Local Rule 56.1(A) because it does not contain a statement of material facts as to which Defendants contend there is no genuine issue to be tried. The motion does, however, contain a section discussing the evidence from Defendants' perspective. Doc. 54, pp. 10-12. Plaintiff was given an opportunity to file a response to Defendants' motion, doc. 56, and he has submitted his opposition. Doc. 57.

Before these motions could be reviewed, Plaintiff filed a motion requesting information on the status of this case.  Doc. 58.  The motion as been granted separately and the parties are advised that this report and recommendation is entered concerning all pending motions.

## I.    Legal standards governing a motion for summary judgment

A plaintiff "seeking to recover upon a claim . . or to obtain a declaratory judgment may . . . move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof."  FED. R. CIV. P. 56(a).  Summary judgment is appropriately granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  Thus, even without affidavits supporting a summary judgment motion, a movant may be granted summary judgment where there is no need for a factual determination at trial and where a clear legal basis exists (such as all the elements of the plaintiff's claim are present) so that judgment should be entered in that party's favor.  *See* Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Where, as here, the issue is one on which the movant bears the burden of proof at trial, the moving party "must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."  Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993), *citing* United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991).

If the movant carries the initial burden, the non-movant then must show the existence of a genuine issue of material fact. Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986); Fitzpatrick, 2 F.3d at 1116. Thus, the non-movant must present evidence sufficient to "call into question the inference created by the movant's evidence on the particular material fact" in order to avoid summary judgment. An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004)(citations omitted). Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient. The court must decide "whether the evidence[1] presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Hickson Corp., 357 F.3d at 1260, quoting Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986). All reasonable inferences must be resolved in the light most favorable to the nonmoving party. Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999).

Local Rule 56.1(A) provides that a motion for summary judgment "shall be accompanied by a separate, short and concise statement of the material facts as to

---

[1] Under Rule 56(e), a nonmoving party must "go beyond the pleadings" to "designate 'specific facts showing that there is a genuine issue for trial.' " Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), cert. denied 522 U.S. 1126 (1998), quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553. The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c). Owen v. Wille, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

which the moving party contends there is no genuine issue to be tried.  Failure to submit

such a statement constitutes grounds for denial of the motion."  Plaintiff's motion

incorporates a statement of facts as to which Plaintiff contends there is no dispute.

Doc. 39, p. 3.  As noted above, Defendants did not submit a statement of facts as to

which they contend that summary judgment should denied.  Defendants essentially

argue that even accepting Plaintiff's version of the facts, Plaintiff's complaint is

insufficient to state a claim and should be dismissed.  Doc. 54, pp. 12-19.  Defendants

further contend that Plaintiff has not come forward with sufficient evidence to support his

allegations.  *Id.*

## II.     Allegations of the complaint

Plaintiff is "currently incarcerated at the United States Penitentiary in Coleman,

Florida," and brings this case pursuant to Bivens v. Six Unknown Fed. Narcotics Agents,

403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971).  Plaintiff contends that

Defendants retaliated against him in violation of the First Amendment because he filed

grievances claiming that prison medical staff violated his right to confidentiality with his

medical records as provided for in the Privacy Act and another lawsuit in federal court.

Doc. 35, attachment.[2]   He asserts that he filed this grievance on October 15, 2002.

Plaintiff further alleges that on April 9, 2003, he filed suit in district court for the District

of Columbia concerning the complaint in this grievance.  He alleges that he was placed

in administrative detention on August 26, 2003, for investigation about his complaint.

He alleges that while this investigation was underway, he was given a retaliatory

---

[2] This case was transferred from the District of Columbia in October, 2004.  Doc. 35.

transfer in violation of his due process rights and the First Amendment right to seek redress of grievances. *Id.*

Plaintiff also asserts a second claim that his Eighth Amendment rights were violated when he was denied visitation with family members. *Id.* Plaintiff additionally contends that his due process rights were violated when prison officials did not conduct an "initial classification, and Program review within four (4) weeks of the Plaintiff's arrival at" the receiving institution following the allegedly retaliatory transfer. *Id.* Furthermore, Plaintiff asserts additional due process violations when prison officials allegedly delayed processing his administrative remedy requests, impeded his access to the remedy process, and committed perjury in responding to an informal resolution attempt. *Id.* Plaintiff seeks monetary and punitive damages "for pain and suffering due to the retaliatory and discriminatory actions . . . ." *Id.*

## III.    Service Issues

Plaintiff's case was initiated in the District of Columbia. *See* fn. 2. Plaintiff is suing eleven Defendants in this case: the Bureau of Prisons and ten individual prison officials. Doc. 35, attachment.[3] Defendants assert in their motion that "there has simply been no service on the individual defendants." Doc. 54, p. 8. In addition, Defendants contend that because Defendants Holt, Dixon-Pruett, Smith, and Tapia all work and

---

[3] On this Court's electronic docket, document 35 contains all the electronic docket entries from the District of Columbia. This order references the documents as they exist on *this* Court's website which, due to the transfer order and docket sheet which was provided by the transferring court, are different numbers. For example, document 4 on this Court's electronic docket is document 1, the Complaint, on the District of Columbia's docket. Doc. 35, attachment.

reside outside of the Northern District of Florida, these four Defendants "must be dismissed from this lawsuit due to a complete lack of personal jurisdiction." *Id.*, at 8.

The documents related to service, docs. 13-17, 25-26, were not addressed by Defendants. The docket reveals that summons and the complaint were served on the United States Attorney, doc. 13, the Bureau of Prisons, doc. 14, and the Attorney General, doc. 15. There are also acknowledgments of receipt of summons and complaint filed on behalf of Defendant Holt, doc. 16; and Defendants Smith, Pruett, Wetzel, Beck, Bard, Davis, Baston, and Rester. Doc. 17. There is additional evidence of service provided for Defendants Beck, Davis, and Baston, doc. 25, and Defendant Rester, doc. 26. The only Defendant for whom there is no evidence of service is Defendant R. Tapia. Thus, Defendants' motion to dismiss should be granted as to Defendant Tapia for failure to serve process and lack of personal jurisdiction, but otherwise should be denied.

## IV.    Bureau of Prisons claim

Private civil actions are authorized against individual persons. Bivens, 403 U.S. 388, 91 S.Ct. at 2004-05, *cited in* Perry v. Bureau of Prisons, 371 F.3d 1304, 1305 (11th Cir. 2004). However, absent "waiver, sovereign immunity shields the Federal Government and its agencies from suit." Begner v. United States, --- F.3d ----, 2005 WL 1922193, at *3 (11th Cir. Aug. 12, 2005), *quoting* F.D.I.C. v. Meyer, 510 U.S. 471, 475, 114 S.Ct. 996, 1000, 127 L.Ed.2d 308 (1994). A Bivens cause of action may not be brought against a federal agency. Meyer, 510 U.S. at 486, 114 S.Ct. at 1006 (declining to extend Bivens in an action against the Federal Savings and Loan Insurance Corporation). Thus, the claims against the Bureau of Prisons should be dismissed.

## V.    Subject matter jurisdiction

Defendants have asserted that Plaintiff has failed to establish subject matter

jurisdiction because Plaintiff brought this action under 42 U.S.C. §§ 1983, 1984, and

1985.  Doc. 54, pp. 6-7.  Plaintiff, however, has plainly attempted to assert civil rights

claims against federal officials.  While those claims may not be brought under color of

state law, the claims may brought under Bivens, *supra*.  As Plaintiff is proceeding *pro

se*, this technical error is not fatal.  The Court must liberally construe the allegations.

"Despite the absence in the complaint of a jurisdictional allegation, the point is without

merit.  If the facts giving the court jurisdiction are adequately set forth in the complaint,

the statutes conferring jurisdiction need not be specifically pleaded."  Elmore v. Hill, 345

F. Supp. 1098, 1099 (W.D. Va. 1972), *citing* Williams v. United States, 405 F.2d 951

(9th Cir. 1969); Schwarz v. United States, 191 F.2d 618 (4th Cir. 1951).  The facts of the

complaint[4] are sufficient to alert the Court and parties to the nature and legal basis for

the complaint.  This will be construed as alleging a civil rights cause of action under

Bivens over which this court has jurisdiction.  28 U.S.C. § 1331.

## VI.    Plaintiff's affidavit

As evidence to support his own summary judgment motion, Plaintiff presented

his affidavit, doc. 40, submitted pursuant to 28 U.S.C. § 1746.  Plaintiff's affidavit

asserts in a conclusory fashion that several Defendants "conspired with perjury" and

falsified Plaintiff's records.  Doc. 40.  Plaintiff disputes a statement made by Angie

Wiesman that review of Plaintiff's disciplinary history revealed Plaintiff had "committed

---

[4] Under the Federal Rules of Civil Procedure, notice pleading is all that is
required.  Int'l Steel Co. v. Charter Builders, Inc., 585 F. Supp. 816 (S.D. Ind. 1984).  No
technical form of pleading is required. Fed. R. Civ. P. 8(e)(1).

various offenses at the Federal Correctional Institution (FCI) in Marianna, Florida." *Id.*
Plaintiff "declares" that his transfer from FCI-Marianna to a high security prison has
resulted in being "placed in a more violent environment." *Id.*

Rule 56(e) mandates that "supporting and opposing affidavits shall be made on
personal knowledge." 147 F.R.D. 647, 658 (1993). Rule 56(e) requires that an affidavit
supporting or opposing summary judgment "shall set forth such facts as would be
admissible in evidence," and must be made on personal knowledge. *Id.* Plaintiff's
affidavit present no evidence as to any specific factual matter. It presents only opinion
and conclusions. The "object of this provision [Rule 56(e)] is not to replace
conclusionary allegations of the complaint or answer with conclusionary allegations of
an affidavit." Lujan v. National Wildlife Federation, 497 U.S. 871, 888, 110 S.Ct. 3177,
3188 111 L.Ed.2d 695 (1990), *citing* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249,
106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *see also* 147 F.R.D. 647, 661-662.
Plaintiff's affidavit is not sufficient to demonstrate Plaintiff's entitlement to summary
judgment and his motion for summary judgment, doc. 39, must be denied.

## VII. Defendants' motion and the relevant Rule 56(e) evidence

In opposing Plaintiff's summary judgment motion and filing their own motion,
Defendants have presented evidence in accordance with Rule 56(c) and (e).
Following Defendants' submission of evidence, Plaintiff was advised to come forward
with his evidence in opposition. Doc. 56. Plaintiff has come forward with some
evidence. *See* doc. 57, attachment. Thus, Defendants' motion and the documents
surrounding that motion have been reviewed to determine whether there is a need for
trial.

## A.     Retaliatory transfer claim

### 1.     Law governing

Conviction for a crime does not mean that a prisoner forfeits all constitutional protections.  Bell v. Wolfish, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979).  Prisoners retain those rights that are not inconsistent with their status as prisoners.  Shaw v. Murphy, 532 U.S. 223, 229, 121 S.Ct. 1475, 1479, 149 L.Ed.2d 420 (2001); see also Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987).  "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."  Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948).  Inmates retain First Amendment protections, Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974), but those protections are limited by many considerations in the prison setting, "including deterrence of crime, rehabilitation of prisoners, and institutional security."  Pell, 417 U.S. at 822-823, 94 S.Ct. at 2804; Procunier v. Martinez, 416 U.S. 396, 412, 94 S.Ct. 1800, 1810-11, 40 L.Ed.2d 224 (1974), cited in O'Lone v. Estate of Shabazz, 482 U.S. 342, 348-49, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987).

In exercising those First Amendment rights, prisoners may not be retaliated against by prison officials.  Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003).  A prisoner states a viable claim when he alleges that prison officials retaliated against him because he exercised a First Amendment right.  Adams v. James, 784 F.2d 1077, 1082 (11th Cir. 1986); see also Mitchell v. Farcass, 112 F.3d 1483, 1490 (11th Cir. 1997) (reversing the district court's dismissal of Mitchell's First Amendment claim for

retaliation); <u>Wright v. Newsome</u>, 795 F.2d 964, 968 (11th Cir. 1986); <u>Bridges v. Russell</u>, 757 F.2d 1155 (11th Cir. 1985) (finding that dismissal was improper concerning prisoner's allegation that he was transferred to another prison in retaliation for exercising First Amendment rights).

A transfer "in retaliation for exercising federal constitutional rights is actionable under § 1983." <u>Adams v. James</u>, 784 F.2d at 1082 (acknowledging that "prison officials may not retaliate against an inmate for exercising a constitutionally protected right"), *citing* <u>Bridges v. Russell</u>, *supra*; *see also* <u>Sisneros v. Nix</u>, 95 F.3d 749, 752 (8th Cir. 1996); <u>Davis v. Kelly</u>, 160 F.3d 917, 920 (2d Cir. 1998) (stating that "prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights.").[5]  In such a situation, injury may be "the retaliatory accusation's chilling effect on" a First Amendment right, rather than a specific harm such as additional confinement or the deprivation of privileges.  *See* <u>Hines v. Gomez</u>, 108 F.3d 265, 269 (9th Cir. 1997) (finding that filing false charges against an inmate infringes on the inmate's "First Amendment right to file prison grievances.").

The Eleventh Circuit has not yet developed a formal method of analysis in prisoner retaliation by transfer cases except to say that a prisoner does not have to prove he would not have been transferred "but for" the assertion of his constitutional

_____

[5] Conduct which is not in itself actionable under § 1983 becomes actionable if undertaken with a retaliatory motive.  <u>Dixon v. Brown</u>, 38 F.3d 379 (8th Cir. 1994) (finding that "[a]lthough the filing of a false disciplinary charge is not itself actionable under § 1983, the filing of a disciplinary charge becomes actionable if done in retaliation for the inmate's filing of a grievance.")  Thus, actions which in themselves are not constitutionally impermissible but which are done "in retaliation for filing lawsuits and administrative grievances . . . violates both the inmate's right of access to the courts . . . and the inmate's First Amendment rights."  <u>Wright</u>, 795 F.2d at 968 (internal citations omitted).

rights. Adams v. Wainwright, 875 F.2d 1536, 1537 (11th Cir. 1989). It is recommended here that the Court adopt the analytical framework adopted by then Magistrate Judge Rodgers of this District. Pate v. Peel, 256 F.Supp.2d 1326 (N.D. Fla. 2003). This analysis, used also in Osterback v. Kemp, 300 F.Supp.2d 1238 (N.D. Fla. 2003), employs the standard established by the Supreme Court for evaluating retaliation claims arising in the public employment setting. See Pickering v. Bd. of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); see also Brochu v. City of Riviera Beach, 304 F.3d 1144, 1157 (11th Cir. 2002).[6] Applying that standard in the prison context requires the following prima facie showing: (1) that the inmate engaged in statutorily protected activity or expression (First Amendment conduct); (2) that an adverse action was taken against him or her; and (3) a causal connection between the First Amendment activity and adverse action. See Thaddeus-X v. Blatter, 175 F.3d 378 (6th Cir. 1999); Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001), citing Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998) (citing Meeks v. Computer Associates Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994)). If the plaintiff establishes a prima facie case, the burden shifts to the Defendant to

_____

[6] Pickering and Mount Healthy used a four step analytical framework: (1) whether as a matter of law the speech at issue may be fairly characterized as involving a matter of public concern; (2) whether as a matter of law the employee's interest in such free speech outweighs the interest of the state in promoting the efficiency of the public services it performs through public employees; (3) whether there is a substantial causal link between the speech and the adverse employment action; and (4) whether the employer has shown that it would have made the same decision based upon its legitimate reason, standing alone. 256 F.Supp.2d at 1337-1338.

"show that he would have taken the same action in the absence of the protected activity . . . ."  Thaddeus-X, 175 F.3d at 399, *citing* Mount Healthy.

There is a split of opinion between the Circuits as to the standard to be used. Several circuits have applied the Mount Healthy and Thaddeus-X methodologies.  *See e.g.,* Graham v. Henderson, 89 F.3d 75, 80 (2d Cir. 1996) (noting that if defendants could show the inmate "would have been disciplined even in the absence of the protected conduct," dismissal would be appropriate); Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998) (same); Babcock v. White, 102 F.3d 267, 275 (7th Cir. 1996) (finding no claim if the action would have taken place regardless of a retaliatory motive); Rauser v. Horn, 241 F.3d 330, 333-34 (3d Cir. 2001); *but see* Walker v. Roth, 967 F.Supp. 250, 252-253 (E.D. Mich 1997) (stating that "in the prison context, [retaliation] claims are analyzed under fourteenth amendment principles of [substantive] due process.").

Some courts have used a more stringent "but for" analysis.  *See* Peterson v. Shanks, 149 F.3d 1140, 1144 (10th Cir. 1998) (requiring a prisoner to "prove that 'but for' the retaliatory motive, the incidents" which he claims were retaliatory "would not have taken place."); Goff v. Burton, 7 F.3d 734, 737 (8th Cir.1993), *cert. denied* 512 U.S. 1209 (1994) (declining to use Mt. Healthy analysis in retaliatory transfer case and applying the more stringent "but for" test; "prisoner must prove that retaliation was the actual motivating factor for the transfer."); Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995), *cert. denied* Palermo v. Woods, 516 U.S. 1084 (1996) (citing Mount Healthy but stating that the prisoner must establish that but for the retaliatory motive the complained of incident would not have occurred); McDonald v. Hall, 610 F.2d 16, 18 (1st Cir. 1979)

(finding inmate "must prove that he would not have been transferred 'but for' the alleged" retaliatory reason).

The Sixth Circuit's Thaddeus-X analysis continues to be followed in the Sixth Circuit. Bell v. Johnson, 308 F.3d 594, 609 (6th Cir. 2002). It has recently been used in this District. See Pate v. Peel, *supra*, Osterback, 300 F.Supp.2d 1238. In light of the Eleventh Circuit's refusal to apply a "but for" analysis, Adams v. Wainwright, 875 F.2d 1536, 1537 (11th Cir. 1989), the Mt. Healthy burden-shifting framework and the Thaddeus-X analysis should again be employed.

An additional reason for implementing this method of analysis is impliedly present in Texas v. Lesage, 528 U.S. 18, 120 S.Ct. 467, 145 L.Ed.2d 347 (1999). There, the United States Supreme Court utilized the Mt. Healthy framework in considering a § 1983 claim challenging an allegedly race-conscious admissions process that the plaintiff claimed violated the Equal Protection Clause. The Supreme Court noted that even though Title VII claims "typically involved alleged retaliation for protected First Amendment activity rather than racial discrimination, . . . that distinction [was] immaterial." 528 U.S. at 20-21, 120 S.Ct. at 468. "The underlying principle is the same: The government can avoid liability by proving that it would have made the same decision without the impermissible motive." *Id.* Accordingly, following the Court's instruction to use the Title VII analytical framework even in a § 1983 case, this standard should be used in deciding this § 1331 civil rights case in the federal prison setting. Implementing the Mt. Healthy burden-shifting analysis in all prisoner civil rights cases, whether brought under § 1983 or § 1331 maintains consistency within this District. Pate

v. Peel, 256 F.Supp.2d 1326, 1337-1340 (N.D. Fla. 2003); Osterback v. Kemp, 300

F.Supp.2d 1238 (N.D. Fla. 2003).

### 2.    Evidence relevant to this claim

The *only* evidence submitted by Defendants as to the reason for Plaintiff's

transfer to a high security prison is a memorandum dated October 31, 2003, to Plaintiff

which states:  "Due to the fact that you are a high security level inmate, you were not

appropriate for a medium level institution (FCI Marianna)."  Doc. 54, exhibit 6.  Plaintiff

asserts that he was previously a medium-level security inmate, *see* doc. 57, and he

suggests in his memorandum in opposition to Defendants' motion that his security or

classification level was changed falsely by Defendants Wetzel, Holt, Beck, and Bard "to

make it look like" Plaintiff had violated prison rules.  Doc. 57.  Attached to document 57

as appendix B are four reclassification forms dated January 17, 2003, June 9, 2003,

September 5, 2003, and January 9, 2004.  Plaintiff's custody level was medium on the

forms dated January 17, 2003, and June 9, 2003.  His custody was changed to high on

September 5, 2003, and remained high on January 9, 2004.  Thus, there is no dispute

of fact that Plaintiff was transferred because his custody level was changed to high.

It is difficult to discern the reason for the change in custody level on September

5, 2003.  In all four of these forms, the entry "Type Discip Rpt," which presumably is the

place where disciplinary reports are counted toward the final custody classification

assignment, reflect zero disciplinary reports.  In other words, the four forms do not seem

to change Plaintiff's custody due to his history of disciplinary reports.  The form for

September 5, 2003, scores 1 point for an "minor escape" and assigned zero points for

responsibility, whereas the earlier forms had zero for escapes and 4 points for

responsibility.  It appears that these changes caused Plaintiff's custody status to change

to high.  Defendants have not explained the basis for either change in scoring, however.

The records are also inconsistent.  There is a "Request for Transfer" form dated

September 12, 2003, attached to document 57.  This form states that Plaintiff was a

high custody inmate, which he was after the change on September 5, 2003, and

asserts: "His institutional adjustment is less than acceptable based upon his disciplinary

history."  The next paragraph lists 12 disciplinary actions, from July, 1993, through

January, 2000.  All of these disciplinary actions existed when the first two custody forms

were completed (on January 17, 2003, and June 9, 2003) assigning medium custody to

Plaintiff.  These disciplinary actions were not new.  If this disciplinary history was

sufficient to assign high custody to Plaintiff, surely the officials responsible for this would

have done so on January 17, 2003.

While Plaintiff's affidavit is generally insufficient to create genuine disputes of

material fact as to most of his claims for purposes of summary judgment in his favor,

Plaintiff asserted the truth of his allegations in the complaint under penalty of perjury.

Within the complaint are some specific allegations of fact which should be considered

by the Court on summary judgment.  As noted above, Plaintiff asserted that he had

sued BOP officials in April, 2003, concerning a grievance he had filed earlier, and he

asserted that on August 26, 2003, he was placed into administrative detention at FCI

Marianna pending an investigation into these allegations.  Complaint attached to doc.

35, p. 5.  The change to high custody status occurred on September 5, 2003, and the

change in custody status compelled Plaintiff's transfer to a higher security institution.

The evidence, sparse as it is, must be viewed in a light most favorable to Plaintiff. The timing of the change of custody and the unexplained inconsistencies in the justification for the change in custody in the documents before this court, compel the conclusion that Plaintiff has satisfied two elements of his claim.  He has shown that he engaged in statutorily protected activity or expression (First Amendment conduct), and he has shown sufficient temporal proximity to give rise to an inference of a causal connection between the First Amendment activity and the alleged adverse action. Further, Defendants have failed to show that they would have taken the action (change of Plaintiff's custody level to high) even had Plaintiff not engaged in First Amendment conduct.  Indeed, Defendants have failed to show anything significant about why they changed Plaintiff's custody level.

It is undisputed that Plaintiff was transferred to a higher security institution based on the change in custody level, USP-Pollock.  The remaining issue is whether this demonstrates that Plaintiff suffered an "adverse action" or, put another way, "an injury sufficiently adverse to give rise to Article III standing."  *See* Thaddeus-X, 175 F.3d at 394, *cited in* Bennett v. Hendrix, — F.3d —, 2005 WL 2174056, at *5 (11th Cir., Sept. 9, 2005).  Defendants have argued that "a transfer to a higher level security institution without more cannot possibly qualify as the sort of adverse action needed to establish a *prima facie* case of retaliation."  Doc. 54, p. 14.  Defendants also contend that the change in custody level and subsequent transfer did not have a "chilling effect on" Plaintiff's engaging in other First Amendment conduct and, thus, is not a sufficient adverse action.  Doc. 54, pp. 14-15.  Defendants have shown that Plaintiff filed six

grievances within the first six months of his transfer to USP- Pollock.  *Id.*, at 14-15; *see* ex. 9.

The issue is not whether this action by Defendants sufficiently deterred this Plaintiff, but whether the acts "would chill or silence a 'person of ordinary firmness' from future First Amendment activities."  Thaddeus-X, 175 F.3d at 397, *quoting* Crawford-El v. Britton, 93 F.3d 813, 826 (D.C. Cir. 1996), *rev'd on other grounds*, 523 U.S. 574 (1998) (other citations omitted); Toolasprashad v. Bureau of Prisons, 286 F.3d at 584 (citing Crawford-El v. Britton, *supra*, and concluding that "[t]he relevant question is not whether a transfer actually interferes with a particular prisoner's ability to exercise his rights but whether the threat of a transfer would, in the first instance, inhibit an ordinary person from speaking.").  This is the objective standard and looks at "ordinary firmness."

> A 'widely accepted standard for' determining whether conduct may be deemed 'adverse' in evaluating First Amendment retaliation claims is on whether the action is "capable of deterring a person of ordinary firmness from exercising his or her right to access the courts."

Osterback v. Kemp, 300 F.Supp.2d at 1256, *quoting* Thaddeus-X, 175 F.3d at 398; Crawford-El v. Britton, 93 F.3d 813, 826 (D.C. Cir. 1996), *rev'd* on other grounds, 523 U.S. 574 (1998); Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2001); Toolasprashad v. Bureau of Prisons, 286 F.3d 576, 585 (D.C. Cir. 2002); Brown v. Crowley, 312 F.3d 782, 787 (6th Cir. 2002).

Alternatively, there is the "subjective test" which requires a plaintiff to show that he or she was "actually chilled" in exercising First Amendment rights.  *See* Curley v. Village of Suffern, 268 F.3d 65, 73 (2d Cir. 2001) (plaintiff must show that First Amendment rights were "actually chilled") (quoting Davis v. Vill. Park II Realty Co., 578

F.2d 461, 464 (2d Cir.1978)); *cited in* <u>Bennett v. Hendrix</u>, 2005 WL 2174056, at *3.

While that standard has been used in a few circuits, the Eleventh Circuit has now

adopted the "objective 'ordinary firmness' " standard as used in <u>Toolasprashad</u>, *supra*,

for proving a retaliation claim.  <u>Bennett v. Hendrix</u>, 2005 WL 2174056, at *3.  The Court

was "persuaded not only by the number of courts applying the 'ordinary firmness' test,

but by the reasoning of those decisions as well."  <u>Bennett</u>, 2005 WL 2174056, at *3.

> An objective standard provides notice to government officials of when their retaliatory actions violate a plaintiff's First Amendment rights.  In contrast, "a subjective standard would expose public officials to liability in some cases, but not in others, for the very same conduct, depending upon the plaintiff's will to fight." [*Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 400 (4th Cir. 2005).]  "[I]t would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity . . . ." [*Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999)].  There is no reason to "reward" government officials for picking on unusually hardy speakers.  At the same time, we recognize that government officials should not be liable when the plaintiff is unreasonably weak-willed or suffers only a "de minimis inconvenience to her exercise of First Amendment rights." *Constantine*, 411 F.3d at 500 (internal quotation omitted); see also [*Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)] ("It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise . . . .").  The "ordinary firmness" test is therefore protective of the interests of both government officials and plaintiffs alleging retaliation.

2005 WL 2174056, at *3.  In adopting this standard, the Eleventh Circuit has clarified

that a plaintiff must show "something more than the mere retaliatory act . . . to give rise

to an actionable" retaliation claim.  2005 WL 2174056, *3.  The "something more" to be

shown "is an adverse affect, and 'adverse effect' depends on context."  *Id.*  The inquiry

focuses"on the status of the speaker, the status of the retaliator, the relationship

between the speaker and the retaliator, and the nature of the retaliatory acts."  <u>Bennett</u>,

2005 WL 2174056, *4, *citing* Thaddeus-X, 175 F.3d at 398 (noting "the definition of adverse action is not static across contexts.").[7]  Thus, there may be more or less protection to a litigant depending on his or her status (employer, free citizen, or prisoner), and the adverse action must be an injury that is more than trivial and "more than *de minimis* inconvenience in the exercise of First Amendment rights."  Bennett, 2005 WL 2174056, *4.

In accordance with Toolasprashad, Bennett, and Thaddeus-X, then, Defendants argument that Plaintiff was still engaging in First Amendment activities does not end the inquiry.  Plaintiff does not have to show that he was "actually chilled" in the exercise of his rights, but he must establish that he was subjected to a retaliatory act that would "likely deter a person of ordinary firmness from the exercise of First Amendment rights." Bennett, 2005 WL 2174056, *6; *see also* Toolasprashad, 286 F.3d at 585 (finding "[t]he relevant question is not whether a transfer actually interferes with a particular prisoner's ability to exercise his rights but whether the threat of a transfer would, in the first instance, inhibit an ordinary person from speaking.").  Nonetheless, it is evidence supportive of the contention that the transfer would not chill the free expression of a person of ordinary firmness of will.  Bennett, 2005 WL 2174056, *6 (citing *Constantine*, 411 F.2d at 500 ("While the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity, it is not dispositive.")).

---

[7] In Thaddeus-X, the court stated that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is considered adverse."  Thaddeus-X, 175 F.3d at 398.

In <u>Thaddeus-X</u>, the court found that "[h]arassment, physical threats, and transfer to the area of the prison used to house mentally disturbed inmates, especially combined with the conditions allegedly present there, would likely have a strong deterrent effect." 175 F.3d at 398.  In <u>Toolasprashad</u>, the court noted the inmate claimed that his "reclassification as a 'special offender' prevented him from obtaining tutoring jobs at FCI-Marianna akin to those at which he excelled at FCI-Allenwood," and also "that his transfer to FCI-Marianna distanced him from his ill parents and from Bureau staff members who could have testified on his behalf at his parole hearing."  286 F.3d at 585. The court held that those claims were sufficient to "deter a person of ordinary firmness" from exercising his First Amendment rights.  286 F.3d at 585, *citing* <u>Crawford-El</u>, 93 F.3d at 826.

Here, the only evidence before the Court is that Plaintiff was moved to a high security institution.  Plaintiff has come forward with little evidence showing how or why this transfer was adverse to him or caused him harm.  Plaintiff has provided several statements in his sworn declaration, doc. 40, that the transfer from FCI-Marianna (a medium level institution) to USP-Pollock (a high level institution) resulted in another subsequent transfer to USP-Coleman, Florida which is "a more violent environment" with more "gang violence and prisons lock downs . . ."  Doc. 40, p. 3.  He has submitted a memorandum dated July 8, 2004, when Coleman was "locked down" "due to amount of weapons discovered and the assault which occurred today."  *Id.*  This insufficient. The evidence is little more than speculation that conditions at Coleman are so adverse when compared to FCI Marianna that a transfer would chill the free exercise of speech of a prisoner of ordinary firmness of will.  Prisons are locked down from time to time due

to assaults and weapons.  There is nothing unusual about the lock-down at Coleman.  It could have happened at FCI Marianna.  Further, there is Plaintiff's litigation history at Coleman.  While the issue is not whether Plaintiff was in fact chilled by the transfer, that he continued to express himself at Coleman demonstrates that a prisoner of ordinary firmness would not be chilled in his First Amendment expressions by the transfer to Coleman

      But more important, evidence as to conditions at USP-Coleman does not show the conditions at USP-Pollock, the location to which Plaintiff was sent and which forms the basis for this claim.  Plaintiff's subsequent transfer to USP-Coleman has not been linked to any conduct of the Defendants in this case.  Plaintiff has presented no evidence showing how the conditions at USP-Pollock differed from the medium security institutional conditions at FCI Marianna.  It is not for the Court to speculate as to how the conditions of confinement at USP-Pollock might have been more harsh than FCI Marianna.  Plaintiff's burden at summary judgment is to show the "adverse" conditions and he has not done so.  Plaintiff has not shown that his alleged injury from being transferred is more than a trivial incident or more than *de minimis* in the context of prison life.  Accordingly, Defendants' motion for summary judgment should be granted as to the retaliation claim.

### B.    Visitation claim

      Plaintiff alleges that his Eighth Amendment rights were violated when he was denied visitation with family members.  *Id.*  Many liberties and privileges must necessarily be surrendered by prisoners.  Overton v. Bazzetta, 539 U.S. 126, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003).  "The very object of imprisonment is confinement."

Overton, 539 U.S. at 131, 123 S.Ct. at 2167. It cannot be said, then, that the denial of

visitation with friends and family is cruel and unusual punishment; it is simply part of the

price of incarceration. *See* Overton, 539 U.S. at 131-32, 123 S.Ct. at 2167.

Even construing Plaintiff's allegations liberally as the Court must do for a *pro se*

litigant and viewing the claim as one alleging the denial of the right of association or the

right to maintain familial relationships, *id.*, the claim is still insufficient.[8] "[I]nmates do not

have an absolute right to visitation, such privileges being subject to the prison

authorities' discretion provided that the visitation policies meet legitimate penological

objectives." Caraballo-Sandoval v. Honsted, 35 F.3d 521, 525 (11th Cir. 1994).

In the Caraballo-Sandoval case, following an incident where it was believed that

Cooper had passed contraband to Caraballo-Sandoval, she was removed from his

visitation list. 35 F.3d at 523. When Caraballo-Sandoval was transferred to an

institution in Georgia, Cooper continued to be denied visitation. *Id.* In an effort to gain

visitation, "Cooper legally changed her name." *Id.* She was then put on Caraballo-

Sandoval's visitation list; but while being escorted to the visiting room, a prison official

"recognized her and terminated the visit." *Id.* Cooper and Caraballo-Sandoval were

married by this time. Caraballo-Sandoval's visitation privileges with Cooper were

suspended for two years for "misleading prison officials" about Cooper's true identity.

---

[8] This analysis also begins from the principle stated earlier that incarceration results in the necessary limitation of privileges and rights, and inmates retain only those rights that are not inconsistent with their status as prisoners or with legitimate penological objectives. "Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law." Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); Overton, *supra.*

*Id.* Cooper and Caraballo-Sandoval both filed suit claiming First Amendment and Due

Process violations.[9]  *Id.*, at 524.  In considering the defense of qualified immunity, the

Court found that plaintiffs "failed to pinpoint a violation of clearly established law."  *Id.*, at

525.  After noting that prisoners do not have absolute First Amendment rights to

visitation, the Court stated: "We believe that concerns that former prison employees

visiting inmates may pose a threat to security because of their knowledge of security

procedures constitutes a legitimate penological objective."  *Id.*

Additionally, in Overton v. Bazzetta, *supra*, the Supreme Court considered First,

Eighth, and Fourteenth Amendments challenges to a variety of Michigan prison

regulations which limited prison visitation.  The Court reiterated that "freedom of

association is among the rights least compatible with incarceration."  539 U.S. at 131,

123 S.Ct. at 2167, *citing* Hewitt v. Helms, 459 U.S. 460 (1983).  Providing a legitimate

penological interest which bears a rational relationship to the challenged action or

regulation will suffice to sustain the prison action and trump rights to association by

prisoners.  Overton, *supra*, *citing* Turner v. Safley, 482 U.S. 78, 89 (1987).

In the case at bar, Defendants have acknowledged that on July 6, 2003,

Plaintiff's "sister, Loretta Swift Clark and her husband were denied entry visitation at

FCI, Marianna because she was not on [P]laintiff's approved visiting list."  Doc. 54, p.

---

[9] Because the regulations gave prison officials discretion in granting visitation, the Court held that the plaintiffs did not have a liberty interest protected by the Due Process Clause.  *Id.,* at 525.  *See also* Kentucky Department of Corrections v. Thompson, 490 U.S. 454, 109 S.Ct. 1904, 1909, 104 L.Ed.2d 506 (1989) ("The denial of prison access to a particular visitor 'is well within the terms of confinement ordinarily contemplated by a prison sentence' [citation omitted] and therefore is not independently protected by the Due Process Clause."). Thus, if the claim at bar is construed as a due process claim, it also fails.

10-11.  A request to add Plaintiff's sister was submitted on June 19, 2003.  *Id.*, at 11.

Due to "complications associated with Ms. Clark's past criminal history, her application

for visiting was not approved until July 8, 2003."  *Id.*, at 11.  It also appears that "[t]he

Counselor assigned to plaintiff's housing unit was away from the institution when the"

visitation request was received from Plaintiff's sister and her husband.  *Id.*, at 13.  As a

result, there was a slight delay in having permission granted to visit.  "Subsequently,

however, the visitors were placed on the plaintiff's visiting list."  Doc. 54, p. 13.  There

was only a short delay in the process of the granting Plaintiff's visitors permission, and

they were able to visit within one month of submitting the request.  Plaintiff has not

come forward with any evidence to dispute these assertions of fact.

The necessity of having visitors be screened for security before being allowed to

visit an inmate is obvious.  Defendants have a valid penological purpose justifying

security screening.  The deprivation about which Plaintiff complains was short-lived and

was constitutionally permissible.  Thus, this claim concerning the denial of visitation

should be resolved in Defendants' favor.

### C.    Due process claim

Plaintiff contends that his due process rights were violated when prison officials

did not conduct an initial classification and program review within four weeks of his

arrival at the receiving institution.  Plaintiff alleges additional due process violations

when prison officials delayed consideration of his administrative remedy requests,

impeded his access to the remedy process, and allegedly committed perjury in

responding to an informal resolution attempt.  *Id.*

It is true that prisoners may "claim the protections of the Due Process Clause." Wolff v. McDonnell, 418 U.S. 539, 556, 94 S. Ct. 2963, 2974, 41 L. Ed. 2d 935 (1974). However, due process exists to protect a liberty interest. The delays about which Plaintiff complains here are not deprivations of a liberty interest protected by due process. Further, it has been uniformly held that the mere existence of a prison grievance procedure confers no liberty interest entitled to due process protection. Massey v. Helman, 259 F.3d 641, 647 (7th Cir. 2001); Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994), *cert. denied*, 514 U.S. 1022 (1995); Mann v. Adams, 855 F.2d 639, 640 (9th Cir.), *cert. denied*, 488 U.S. 898 (1988); Ouzts v. Cummins, 825 F. 2d 1276 (8th Cir. 1987). Thus, a failure to process a grievance according to the specified procedures is not actionable as a violation of constitutional rights. Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993). Therefore, these claims should be dismissed for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e).

## VIII.   Conclusion

In light of the foregoing, it is respectfully **RECOMMENDED** that Plaintiff's motion for summary judgment, doc. 39, be **DENIED**; that Defendants' motion to dismiss, doc. 54, be **GRANTED** and Plaintiff's complaint, doc. 1, be **DISMISSED** as to the Bureau of Prisons and Defendant Tapia; that Defendants' motion for summary judgment, doc. 54,

be **GRANTED** in favor of the remaining Defendants; and that the Clerk be **DIRECTED**

to enter judgment in favor of all Defendants.

      **IN CHAMBERS** at Tallahassee, Florida, on September 15, 2005.


                **s/    William C. Sherrill, Jr.**
                **WILLIAM C. SHERRILL, JR.**
                **UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

      **A party may file specific, written objections to the proposed findings and recommendations within 10 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**